USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/19/2008

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

DYLAN MCCRACKEN and
PAUL WATCHORN, individually
and on behalf of all persons
similarly situated,

              Plaintiffs,

     - against -

BEST BUY STORES, L.P., TIME, INC.
and DOES 1 through 50,

              Defendants.

- - - - - - - - - - - - - - - - - -x

**OPINION**

06 Civ. 783 (DC)

**APPEARANCES:** (see last page)

**CHIN, District Judge**

      Before the Court is plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23. Plaintiffs seek to certify a class of "all consumers who purchased merchandise from Best Buy since February 2003 and were improperly charged for a magazine subscription to <u>Sports Illustrated</u>, <u>Entertainment Weekly</u>, or <u>Time</u> and who have been damaged." (Compl. ¶ 33).[1] Plaintiffs proceed based on theories of breach of contract and unjust enrichment.

      Because it is clear that plaintiffs' claims rely on oral representations of individual sales clerks that do not lend themselves to "generalized proof," the motion for class certification is denied.

---

[1] "Compl." refers to the second amended class action complaint.

## BACKGROUND

**A.   Facts**

I make the following findings of facts based on the deposition testimony, affidavits, and exhibits submitted by the parties in connection with this motion. In re Initial Pub. Offering Sec. Litig. (In re IPO Sec. Litig.), 471 F.3d 24, 27, 41 (2d Cir. 2006) (when adjudicating motion for class certification, "all of the evidence must be assessed as with any other threshold issue"; "the judge [must] resolve factual disputes" relevant to motion).

### 1.   Plaintiffs' Transactions at Best Buy

The two named plaintiffs are Dylan McCracken and Paul Watchorn, both of whom purchased subscriptions to magazines published by defendant Time, Inc. ("Time") when they were purchasing other merchandise at stores operated by defendant Best Buy Stores, L.P. ("Best Buy").

#### a.   McCracken

On September 9, 2005, McCracken was shopping at a Best Buy store in Los Angeles, California. (Cavanna Decl. Ex. 4). When he used his debit card to purchase six DVDs, the cashier offered "free issues of the magazine of [his] choice." (McCracken Dep. at 24:7-9; 25:15-16).[2] He accepted the offer after he "made sure [the magazines were] free and it wasn't a gimmick." (Id. at 26:25-27:2).

---

[2]   Exhibit 1 of Gregory A. Clarick's Declaration contains the transcript of McCracken's November 2, 2007 deposition.

Although he does not recall "the precise chronological order of the events" of the transaction, McCracken did sign an electronic signature pad, which stated the following:

> I AUTHORIZE BestBuy [sic] to give my credit/debit card to SI to CHARGE MY CARD after the 8 issue trial for 24 issues (8 + 16 more) at $24.95 & to charge auto renewals every 6 months at then current rate. See flyer.

(Id. at 25:10-11; 39-41; Boe Decl. Ex. 6). McCracken signed his name immediately below this language. He only "glanced over" the disclosure on the signature pad and "didn't really pay much attention to it." (McCracken Dep. at 40:9-10). Nevertheless, he was given the material terms of the magazine offer prior to completing the transaction.

McCracken also received a receipt, which showed that he was charged "$0.00" for Sports Illustrated. (Id. at 51-52; Cavanna Decl. Ex. 4). In addition, the receipt contained the following information about the magazine offer:

> NO RISK: If within 8 issues you do not want the magazine, call SI at 1-800-284-8800 or go online to: WWW.SICUSTOMERSERVICE.COM and you will not be charged. If you do not cancel during the 8 issue trial, SI will charge your card $24.95 for the initial 24 issue subscription term (8 issue trial + 16 more, 24 total issues).

(Id.). McCracken also "glanced over" the disclosure section of the receipt, but "did not absorb it completely." (McCracken Dep. at 52:4-5).

McCracken does not remember whether the sales clerk gave him the flyer mentioned on the signature pad (id. at

26:12-13; see also id. at 31:9-18), even though at the point of sale, clerks were supposed to give each enrolling customer a brochure containing the material terms of the magazine offer (Boe Decl. ¶¶ 8, 14; id. Ex. 1). See also Labajo v. Best Buy Stores, L.P., 478 F. Supp. 2d 523, 526 (S.D.N.Y. 2007). Time mails a confirmation notice to customers who purchase a subscription, which reiterates the automatic renewal and cancellation provisions of the offer. (Cavanna Decl. ¶ 7; id. Exs. 6, 7). McCracken also does not recall receiving this notice. (McCracken Dep. at 58:13-16).

McCracken was charged for one subscription term on November 19, 2005, but he cancelled and received a full refund of $24.95 on December 1, 2005. (Id. at 67:14-18; Cavanna Decl. ¶ 10).[3] His alleged damages, however, are the fees that were assessed when his bank account was overdrawn for insufficient funds. (McCracken Dep. at 67, 80-82; Clarick Decl. Ex, 3).

### b. **Watchorn**

On January 19, 2005, Watchorn purchased a prepaid cell phone at a Best Buy store in Jacksonville, Florida. (Clarick Decl. Ex. 5). He learned about the magazine offer from a sales clerk during checkout. (Watchorn Dep. at 27:9-16).[4] In her

---

[3] Although McCracken did not recall receiving the flyer or confirmation notice, I find that he understood the terms of the offer. That he understood that he had the right to cancel is shown by all the circumstances and the fact that he exercised that right and was given a refund.

[4] Exhibit 4 of Clarick's Declaration contains the transcript of Watchorn's October 23, 2007 deposition.

-4-

presentation of the offer, the clerk used the phrases "free magazines" and "trial subscription." (Id. at 27:23-24, 28:12-13).

Watchorn paid for his purchase in cash, but provided his credit card and signed an electronic signature pad when the sales clerk informed him that a credit card was required "for verification purposes." (Id. at 25:3-7). Watchorn testified that the signature pad did not display any disclosure (id. at 55:11-13), but he is wrong.[5] The signature pad contained the following language:

> Yes! Sign me up for Entertainment Weekly's 8 issue trial offer with automatic renewal. I authorize Best Buy to give my credit or debit card to EW and EW to charge my card for the initial and six month renewal terms.

(Boe Decl. Ex. 6). Watchorn signed immediately below. (Id.). He was thus given the material terms of the offer before he signed the signature pad, except that he was not told the price of a magazine subscription.

Watchorn also received a receipt, which showed that he was charged "$0.00" for Entertainment Weekly. (Watchorn Dep. at 69; Cavanna Decl. Ex. 5). In addition, the receipt contained the same information as the signature pad as well as the following information about the magazine offer:

---

[5] Michael Boe attested in his Declaration that the image of the electronic signature pad with Watchorn's signature is a "true and accurate cop[y] of the document[] that [it] purport[s] to represent." (Boe Decl. ¶ 15). I find that, more likely than not, the electronic signature pad contained the disclosure.

> AUTOMATIC RENEWAL: For your convenience, after the initial 24-issue subscription term, should you decide to continue with the magazine do nothing. EW will automatically continue your subscription unless you tell us to stop. You authorize EW to charge your credit/debit card for the initial subscription term and every six months after that at the guaranteed low price in effect.

(Id.). Watchorn testified that he did not know whether the receipt contained the disclosure. (Watchorn Dep. at 70:21-25). This testimony, however, is rejected in light of the copy of the receipt that lists Watchorn's name, address, and the prepaid cell phone he purchased. (Cavanna Decl. Ex. 5).

In addition, Watchorn testified that he did not receive the brochure or confirmation notice, both of which reiterated the material terms of the magazine offer. (Watchorn Dep. at 33:13-19, 73:2-5, 74:21-24, 76:9-17).

Watchorn received more than sixty issues of Entertainment Weekly before contacting Time to cancel his subscription. (Cavanna Decl. ¶ 11). He never asked for, and did not receive, a refund. (Id.; Watchorn Dep. at 93:7-9).

### 2. **Training Program for Best Buy Clerks**

Best Buy trained its sales clerks to promote and explain the magazine offer to potential subscribers. In conjunction with on-site training, Best Buy used several written training materials. (See Boe Decl. Ex. 8).

Sales clerks were instructed first to pique customers' interest and to "[d]etermine if the customer is interested in the

offer." (Id. at 400).[6]  "To do this," the training manual continues, sales clerks "need to ask questions like the ones below," and the manual then lists several sample dialogues on a page entitled "Says & Dos," such as:

> Would you like to try eight issues of either <u>Entertainment Weekly</u> or <u>Sports Illustrated</u> risk-free?
>
> This game is one of my favorite football titles.  Are you a big sports fan?  Did you know that you can get an 8 week risk-free trial of Sports Illustrated here today?

(Id.).  Although all of the sample dialogues contain the words "risk-free" and use substantively similar language, the training manual states that "[t]here are many ways to word this question so [sales clerks] should do so in a way that's comfortable for [them] without leaving out any important information."  (Id. at 386).

Once the clerk has determined that "the customer is interested," the clerk is then instructed "to explain the offer in more detail to be sure they understand what they're signing up for."  (Id.).  Clerks were instructed as follows:

> Do: Show the Customer the brochure [containing the terms of the magazine offer] and a sample magazine.
>
> Say: If you like the magazine, do nothing and your card will be automatically charged $24.95 for 16 more issues (a total of 24) at $1.04 an issue. . . . If you decide not to subscribe, just call the number on the back of the brochure within the first eight issues

---

[6] Exhibit 8 contains several training manuals, which are not paginated consecutively.  The page numbers used herein refer to the bates stamp numbering.

-7-

>           and you won't be charged.  After the first 24
>           issues, renewal is automatic and your card
>           will be charged every six months until you
>           decide to cancel.

(Id. at 387).  Although this dialogue was spelled out in the training manual, there was "no oral script for the Subscription Program."  (Boe Decl. ¶ 6).  Rather, "cashiers were urged . . . to develop and personalize their own natural and comfortable inquiries and responses to the customers."  (Id.).  Hence, if the sales clerks followed the training materials, they advised customers the subscriptions would be automatically renewed if they did not cancel.

### 3. Customer Complaints about the Magazine Offer

Within a seven-month period from August 2006 to March 2007, Best Buy received 4,400 comments about the magazine subscription program, which comprised 5 percent of all comments received from Best Buy customers during that time.  (Fearon Decl. Ex. 1 at 4).  Many of the complaints about the program indicate that some customers were not told by a sales clerk that the magazine offer included an automatic renewal provision, which required affirmative action on the part of customers to cancel the subscription before charges applied.  For instance, one customer complained that "a Best Buy cashier attempted to deceive me with a free magazine subscription.  The cashier did not tell me that I would have to pay for the magazine subscription after eight weeks."  (Id. at 10).

But not all complaints about the program concerned sales clerks' non-disclosure. Many customers expressed annoyance that the magazine was offered in the first place. For example, one customer "would prefer that [Best Buy] not ask about magazine [subscriptions] at checkout. It's annoying." (Id. at 7). Another "recommend[ed] not offering the magazines when [customers] checkout [sic]. I am not going to [Best Buy] to buy magazines." (Id.).

In the end, in view of the many subscriptions sold by Best Buy (see Fearon Reply Decl. Ex. 1 at 3 (Best Buy earned $39.2 million annually from the magazine subscription promotion)), only a small percentage of subscribers complained about sales clerks' non-disclosure of the terms of the magazine offer.

**B. Procedural History**

This action was commenced by former plaintiff Christina Labajo. Defendants filed a motion to dismiss, which the Court granted in part and denied in part on March 15, 2007. Labajo v. Best Buy Stores, 478 F. Supp. 2d at 523.

Thereafter, Labajo filed this motion and a motion to intervene on behalf of McCracken and Watchorn. The motion to intervene is now moot pursuant to the parties' stipulation dated July 10, 2007 naming McCracken and Watchorn as plaintiffs. McCracken and Watchorn filed the second amended class action complaint on July 11, 2007. It asserts claims for (1) unjust enrichment and restitution and (2) breach of contract.

Plaintiffs explicitly state that they are excluding from this action "all allegations sounding in fraud." (Compl. ¶ 77).

After defendants reported that their records showed that Labajo had already received a refund for the magazine subscription she received through Best Buy's magazine promotion, the parties agreed to dismiss Labajo as a plaintiff in this action pursuant to a stipulation dated July 17, 2007.

The parties conducted discovery on the class certification issue, and this motion followed.

## **DISCUSSION**

### **A.  Class Certification Requirements**

To maintain a class action, plaintiffs must meet the requirements of Rule 23(a) of the Federal Rules of Civil Procedure -- numerosity, commonality, typicality, and adequacy of representation -- and show that the putative class falls within one of the three categories set forth in Rule 23(b). See Fed. R. Civ. P. 23; In re IPO Sec. Litig., 471 F.3d at 33. Plaintiffs bring this putative class action under Rule 23(b)(3), which requires plaintiffs to show that (1) questions of law or fact common to the class predominate and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. See Fed. R. Civ. P. 23(b)(3).

The Second Circuit recently clarified the standards governing adjudication of a motion for class certification:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such

> determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement.

471 F.3d at 41. It thus overruled the holding in Caridad v. Metro-North Commuter R.R., 191 F.3d 283 (2d Cir. 1999), that permitted courts to certify a class based on "some showing" of compliance with the Rule 23 requirements.

Because I deny class certification on the ground that common questions of law or fact do not predominate over individual issues, I proceed directly to the predominance analysis, without reaching the requirements of Rule 23(a).

**B.    Predominance of Common Questions**

Rule 23(b)(3)'s predominance requirement is more demanding than the commonality requirement under Rule 23(a) and ensures that "proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997). Class-wide issues predominate if "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof and if these particular issues are more substantial than the issues subject only to individualized proof." Moore v. Painewebber, Inc., 306 F.3d

1247, 1252 (2d Cir. 2002). At issue here is whether plaintiffs have met their burden of establishing that the putative class claims involve predominately common questions that can be resolved through generalized proof. See Bakalar v. Vavra, 237 F.R.D. 59, 63 (S.D.N.Y. 2006) (holding that a movant seeking class certification bears the burden of satisfying Rule 23 requirements).

In their unjust enrichment and restitution claim, plaintiffs argue that defendants obtained sales of the magazine subscriptions "by withholding information from plaintiffs and the other Class members." (Compl. ¶ 79). In their breach of contract claim, plaintiffs allege:

> 87. Each defendant entered into a contract with each Class member under which defendant agreed to provide them with certain merchandise or services.
>
> 88. Each defendant breached these agreements by assessing improper charges.

(Id. ¶¶ 87, 88).

These claims, however, are undercut by the documentation. At a minimum, both McCracken and Watchorn signed the electronic signature pad, which disclosed the automatic renewal term of the agreement, and they received a receipt that reiterated the terms. More likely than not, they also received the brochure and confirmation notice. Hence, they were told at least two, and as many as four, times that the subscription would be automatically renewed and their credit or debit cards charged unless they cancelled within the first eight weeks.

Moreover, the law is well settled that "a party may not offer proof of prior oral statements to alter or refute the clear meaning of unambiguous terms of written, integrated contracts." Meinrath v. Singer Co., 482 F. Supp. 457, 460 (S.D.N.Y.), aff'd, 697 F.2d 293 (2d Cir. 1982). Parol evidence may be admitted to complete the agreement or to resolve ambiguity if an agreement is not fully integrated, but "it may not be admitted to vary or contradict its contents." Simpson v. Mutual of Omaha Ins. Co., No. 97 Civ. 1339 (JGK), 2000 WL 322780 (S.D.N.Y. Mar. 28, 2000).

Parties also have a duty to read what they sign. Consolidated Edison Co. of N.Y., Inc. v. United States, 221 F.3d 364, 371 (2d Cir. 2000) ("In general, individuals are charged with knowledge of the contents of documents they sign -- that is, they have 'constructive knowledge' of those contents." (citing Betaco, Inc. v. Cessna Aircraft Co., 32 F.3d 1126, 1136 (7th Cir. 1994) ("As a result of [the duty to read the contract,] a person who signs a written contract is bound by its terms regardless of his or her failure to read and understand its terms."))). Plaintiffs cannot argue that they did not read the electronic signature pads when they signed their names; they are bound by what they signed.

For plaintiffs to have any chance of prevailing then, they must rely heavily on the oral representations made to them by individual sales clerks. For example, to prevail on their breach of contract claim, plaintiffs would have to show that the contract was wholly an oral one and created solely by the

-13-

discussions with the sales clerks -- that the contract was made before the written disclosures, or that the written contract was not fully integrated and was modified by oral representations. To prevail on the unjust enrichment and restitution claim, plaintiffs must prove that the sales clerks withheld material information that they had a duty to disclose.[7]

Although courts have certified class actions under Rule 23(b)(3) for breach of contract and unjust enrichment, claims that are based on oral communications are generally not amenable to class treatment because individual issues tend to predominate where liability depends on the specific representations made to each plaintiff. Compare Lowenschuss v. Bluhdorn, 72 F.R.D. 498 (S.D.N.Y. 1976) ("contract claim is appropriate for class action certification"), and Dubin v. E.F. Hutton Group, Inc., 845 F. Supp. 1004 (S.D.N.Y. 1994) (case involving class action claims for breach of contract and unjust enrichment), with Basco v. Wal-Mart Stores, Inc., 216 F. Supp. 2d 592, 602-03 (E.D. La. 2002) (individual issues predominated where plaintiffs would be required to prove the terms of oral contracts), and Cohn v. Massachusetts Mut. Life Ins. Co., 189 F.R.D. 209, 215 (D. Conn. 1999) (no predominance where the resolution of breach of contract claim depended on the representations made to each plaintiff), and Sprague v. Gen. Motors Corp., 133 F.3d 388, 398 (6th Cir. 1998) (no common questions where proof of each contractual

---

[7] See Labajo, 478 F. Supp. 2d at 529-31 (denying motion to dismiss, based solely on allegations of complaint).

agreement depended on documents and representations for each plaintiff).

The Second Circuit has not addressed whether a restitution or breach of contract claim based on oral representations in a context such as this is amenable to class action treatment, but it has addressed a similar issue in <u>Moore v. Painewebber</u>, which provides guidance here.  In <u>Moore</u>, the plaintiffs alleged that the defendant, through its sales agents, committed fraud by engaging in a common scheme to misrepresent an insurance policy as part of an investment package.  But the <u>Moore</u> Court held that "class certification of fraud claims based on oral misrepresentations is appropriate only where the misrepresentations relied upon were <u>materially uniform</u>, allowing such misrepresentations to be demonstrated using generalized rather than individualized proof."  <u>Moore</u>, 306 F.3d at 1249 (emphasis added).  A "common course of conduct" that induced fraud on the plaintiffs was "not sufficient to establish liability of the defendant to any particular plaintiff" because "each plaintiff must prove that he or she personally received a material misrepresentation."  <u>Id.</u> at 1255.

The Second Circuit acknowledged, however, that class certification may be suitable if the communications with the plaintiffs could be proven with generalized proof, such as evidence that the sales agents followed a standardized sales script.  <u>Id.</u> (concluding that use of standardized sales script, though sufficient, is not necessary to establish material

uniformity). With evidence of uniform misrepresentation, questions of liability on a class scale "may then be [a] simpler matter[] to determine." Id.

Class treatment of breach of contract and unjust enrichment claims based on individual oral communications poses the same difficulties as a class action for fraud based on oral misrepresentation. To establish liability in this case, each plaintiff would have to prove that a sales clerk misrepresented or failed to disclose material terms. Although plaintiffs may be able to prove that defendants engaged in a "common course of conduct" in a broad sense, individualized proof is necessary to establish liability.

Plaintiffs, however, have neither alleged nor submitted evidence that the presentation of the magazine offer was "materially uniform" among all sales clerks. Nor were sales clerks given standardized scripts to follow when promoting the magazine offer. The training materials, which suggested various ways that sales clerks could present the magazine offer, confirm that clerks "were urged . . . to develop and personalize their own natural and comfortable inquiries and responses to the customers." (Boe Decl. ¶ 6). There is nothing in the record to suggest that a cashier in Los Angeles, California would make the same pitch given by a sales clerk in Jacksonville, Florida, and the facts of this case demonstrate otherwise. Indeed, plaintiffs concede that "the factual circumstances of their claims may differ" and that "oral statements [were] made to each Best Buy

-16-

customer." (Pl. Mem. at 4). Moreover, the training materials instructed sales clerks to disclose the automatic renewal provision of the offer, and if sales clerks followed these instructions, there was no misrepresentation.

The numerous customer complaints submitted as evidence by plaintiffs show that there were, in fact, material variations in the sales pitches used by Best Buy clerks. Cf. Moore v. Painewebber, 306 F.3d at 1256 (variations in customer complaints demonstrate that oral representations were not materially uniform). Although a number of these complaints indicate that clerks did not tell customers that they were signing up for an automatically renewing magazine subscription (Fearon Decl. Ex. 1 at 9-10), others understood that the promotion ultimately entailed the purchase of a subscription and criticized "the idea of the cashier's [sic] trying to sell magazine subscriptions at checkout time" (id. at 7) (emphasis added). Another customer complaint noted that the cashier did mention that "canceling is easy." (Id.). This evidence demonstrates that the oral disclosures regarding the magazine subscription program varied, and that the Best Buy clerks did not conduct materially uniform sales presentations.

Even taking it at face value, the testimony of McCracken and Watchorn demonstrates that material differences existed in the oral presentations they encountered and that individualized inquiry is required. For instance, although McCracken had very little recollection of the conversation, he

recalled his sales clerk using the phrase "free issues" and "perhaps" the words "risk free." (McCracken Dep. at 25:9-24). He could not even recall whether the sales clerk offered him the three specific magazines as options. (Id. at 25:25-26:6). Watchorn testified that his sales clerk said they were "offering free magazines," "would [he] like to have any of [<u>Entertainment Weekly</u>, <u>Time</u>, or <u>Sports Illustrated</u>] for free," and that "[i]t was a trial subscription." (Watchorn Dep. at 27:20-28:13). He recalled that the sales clerk did not tell him anything else, that she did <u>not</u> mention how many magazines he would receive and that she did <u>not</u> say that he would be charged for a 24-week subscription if he did not cancel after eight issues. (Id. at 28:6-32:7).

In addition, during the transaction, McCracken may have received a brochure containing the terms of the offer; Watchorn claims he did not. McCracken noticed the disclosure section of his sales receipt; Watchorn did not. When offered "free" magazines, McCracken "took some time and thought" about the offer and questioned the sales clerk to make "sure it was free and it wasn't a gimmick." (McCracken Dep. at 26:25-27:2). Watchorn, however, did not ask for any clarifications about the offer. (See, e.g., Watchorn Dep. at 28:22-24, 33:10-12, 34:23-35:14). At bottom, each plaintiff had different interactions with a Best Buy sales clerk.

Although factual variations do not necessarily defeat a motion for class certification, here individual issues

-18-

predominate. Hence, the claims are not amenable to class action treatment under Rule 23(b)(3). In re Blech Sec. Litig., 187 F.R.D. 97, 107 (S.D.N.Y. 1999) ("In determining whether common questions of fact predominate, a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class."). Accordingly, plaintiffs have not satisfied Rule 23(b)(3)'s predominance requirement.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion for class certification is denied. The Court will conduct a conference by telephone on March 24, 2008, at 11:30 a.m.

SO ORDERED.

Dated: New York, New York
March 19, 2008

DENNY CHIN
United States District Judge

**APPEARANCES**

SQUITIERI & FEARON, LLP
    By:  Stephen J. Fearon, Jr., Esq.
         Maria J. Ciccia, Esq.
         Charis M. Ford, Esq.
32 East 57th Street, 12th Floor
New York, New York 10022
Attorneys for Plaintiffs

ROBINS KAPLAN MILLER & CIRESI
    By:  Anne Michele Lockner, Esq.
         Bradley Mitchell Orschel, Esq.
         Emily Jean Prentice, Esq.
800 La Salle Avenue, Suite 2500
Minneapolis, Minnesota 55402
     - and -
FOLEY & LARDNER, LLP
    By:  Todd C. Norbitz, Esq.
         Peter Neil Wang, Esq.
90 Park Avenue
New York, New York 10016
Attorneys for Best Buy Stores, L.P.

MANATT, PHELPS & PHILLIPS, LLP
    By:  Gregory A. Clarick, Esq.
         Jonathan Desow Melber, Esq.
         Kimo S. Peluso, Esq.
7 Times Square
New York, New York 10036
Attorneys for Time, Inc.